IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FLORIN G. PLENICEANU,                    )
                                         )
              Plaintiff,                 )
                                         )
       v.                                )        No. 05-C-5675
                                         )
BROWN PRINTING COMPANY,                  )
                                         )
              Defendant.                 )

MEMORANDUM OPINION AND ORDER REGARDING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

JAMES F. HOLDERMAN, Chief Judge:

Plaintiff Florin G. Pleniceanu ("Pleniceanu"), sues his former employer, Brown Printing

Company ("Brown"), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to e-

17, alleging a hostile work environment and discriminatory discharge based on national origin.

Brown filed a motion for summary judgment (Dkt. No. 25). For the reasons stated below, the

court denies the motion in part and grants the motion in part.

BACKGROUND

Taking all facts and inferences in favor of the nonmoving party, Pleniceanu, the court

recounts the facts underlying the lawsuit. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

255 (1986). Brown operates a printing plant in Woodstock, Illinois, including a binding

operation. The binding operation involves the assembly of books or magazines after the

individual pages, inserts, and covers have been printed. (Def. 56.1. ¶ 5.) Brown employs

bindery operators to supervise the operation of the binding machine with the assistance of

assistance operators. (Def. 56.1. ¶ 4.) Brown monitors the quality of the binding through a

1

"time-stamp" process to determine, for example, whether the books or magazines contain the correct number pages or inserts and cards. (*Id*. at ¶¶ 4, 5.) A "time stamp" is a representative sample of a bound book that is pulled at regular intervals from a pre-determined number of bound books, which is typically one time stamp for every 5000 bound books. (*Id.* at ¶ 16.) The time stamp is then checked for quality issues, like whether the books are square, the customer addresses are positioned correctly, and the correct insert cards are used. (*Id.*) A sticker is placed on the time stamp with a checklist addressing these quality issues. (*Id.*) The bindery operator has the primary responsibility to pulls the books at the timed intervals and check the quality factors on each time stamp. (Pl. Res. 56.1. ¶ 16.) Once signed, time stamps are placed in the bindery office at the end of a shift. There is no policy specifically prohibiting an operator from retrieving his time stamps from the bindery office after an operator has dropped off the time stamps.

During the relevant period, issues with poor work product or production were ultimately handled by Wayne Bishop, the bindery manager for the Woodstock plant, although the supervisors often brought these issues to his attention. (Pl. Res. 56.1 ¶ 20.) There were eight supervisors in all that reported to Bishop. (Bishop Dep. at 7.) Bishop would take input from the supervisors about disciplinary measures with regard to errors or misprinted books. (Pl. Res. 56.1 ¶ 20.) In most cases, discipline for poor work product or poor production began at the supervisory level and escalated to Bishop. (Bishop Dep. at 11-13.) Bishop would also rely on the supervisors to inform him of events that occurred, especially if the event took place during the second or third shift, which Bishop did not work. (*Id*.) Supervisors had "the latitude to fire and hire in certain situations." (Bishop Dep. at 150.)

Brown also maintained in its Employment Handbook a policy against harassment and offensive behavior. (Def. 56.1 ¶ 11.) The policy entitled "Prohibited Offensive Behavior" stated that:

> Employees are prohibited from engaging in sexual or personal harassment based on race, creed, color, national origin, age, disability, marital status, sexual orientation or status, veteran status or status with respect to military service or other harassment prohibited by federal, state or local laws.

(Def. 56.1 ¶ 11.) The policy further stated that:

> Any other conduct which has the effect of interfering with an individual's work performance or conducting an intimidating, hostile or offensive work environment is prohibited. Conduct which is by word or action offensive or degrading to another person will not be tolerated and will subject the offending employee to disciplinary action, ranging from verbal warning to termination of employment.

(Def. 56.1 ¶ 12.) According to the policy, employees who believe that they has been the subject of harassment or witnesses to the harassment were to report the conduct promptly to their supervisor, department manager, designated Human Resources representative, or the Human Resources Manager. (Def. 56.1 ¶ 13; Pl. Res. 56.1 ¶ 13.)

Pleniceanu, who was of Romanian national origin, was employed as a bindery operator at the Woodstock plant during the third shift on the C-crew until his termination on February 16, 2004. He worked next to fellow bindery operator Rodger Schneider ("Schneider"). (Def. 56.1 ¶ 22, 23.) Andrew Patterson was Pleniceanu's and Schneider's supervisor on the third shift, along with 65-70 other full time employees and a varying number of temporary workers. (Bishop Dep. at 7.) Patterson, who had previously been an assistant operator who worked in the same crew as Pleniceanu, was promoted to the position of supervisor in December 2002 and began supervising Pleniceanu and Schneider in July 2003. (Def. 56.1 ¶ 8) In December 2003, Edward Davis, the Human Resources Manager, held a meeting with the C-crew, including Pleniceanu and

Schneider, which included a review of Brown's anti-harassment policies.  (Def. 56.1 ¶ 33.)

Before becoming Pleniceanu's supervisor, Patterson would refer to Pleniceanu by the nickname "Romanian."  (Pl. Res. 56.1. ¶ 24.)  Once Patterson became Pleniceanu's supervisor, Patterson began making derogatory remarks about Pleniceanu's national origin on almost a daily basis from September 2003 to the beginning of February 2004.  (Def. 56.1. ¶ 27; Pl. Res. 56.1. ¶ 27.)  Patterson would call Pleniceanu about once a day to every other day a "dumb Romanian," "butt fucking Romanian," "fucking Romanian," "fat Romanian," "fucking immigrant," or some combination thereof.  (Def. 56.1 ¶ 27; Pl. Res. 56.1. ¶ 27; Pl. 56.1 ¶¶ 2, 3)  Patterson also told Pleniceanu that he had "come here and suck[ed] on welfare" and that Pleniceanu was "coming and taking American jobs."  (Pl. Res. 56.1. ¶ 27; Pl. 56.1 ¶ 2.)  Further, Patterson stated to Pleniceanu, "Oh, you Romanians, you're stupid, you don't know anything."  (Pl. 56.1 ¶ 3.)

Patterson would also threaten Pleniceanu with demotion.  (Pl. 56.1 ¶ 20.)  Patterson repeatedly told Pleniceanu that he had the power over him to make him lose money, that he could fire Pleniceanu, that he could demote Pleniceanu to a utility person if he wished, and that he could replace Pleniceanu with an assistant operator named John Uden ("Uden").  (*Id.*)  Uden later replaced Pleniceanu when Pleniceanu was fired.  (Pl. 56.1 ¶ 20.)

Schneider, who worked as a bindery operator next to Pleniceanu, recalled in his deposition hearing the near-daily comments that Patterson made to Pleniceanu.  (Pl. 56.1. ¶ 4.)  Schneider knew from Pleniceanu that Patterson's comments were degrading to Pleniceanu and that Pleniceanu was "tired" of Patterson "calling [him] either a fat Romanian or a stupid Romanian."  (Schneider Dep. at 14, 63.)  When asked during his deposition why Schneider did not report the observed harassment, in accordance with Brown's Prohibited Offensive Behavior

policy, Schneider responded that, "When I realized [the comments] bothered him, [Pleniceanu] just said he would take care of it." (Schneider Dep. at 63.) Schneider therefore did not report the conduct because he "believed that [Pleniceanu] had it under control." (Schneider Dep. at 57.)

Pleniceanu was afraid that he would lose his job if he reported Patterson to Bishop and, specifically, his health insurance because his child at the time was undergoing multiple surgeries to repair his esophagus. (Pleniceanu Dep. at 69.) Pleniceanu's fear stemmed from his view that Patterson close friends with Bishop. (Pleniceanu Dep. at 69.) Patterson was hired by Bishop to be a supervisor and spent time in Bishop's office. (*Id.*) In addition, Pleniceanu attested in his deposition that he had been warned by another supervisor, Mike Turner, that Patterson was "out to get [him]."[1] (*Id.* at 42.)

Pleniceanu in his deposition concedes that he did not follow Brown's anti-harassment policy and report Patterson's conduct, presumably to Bishop or Edward Davis ("Davis"), the director of Human Resources. (Pleniceanu Dep. at 66.) Instead, Pleniceanu told Patterson on two occasions, once in November 2003 and once in January 2004, that "his comments made me very uncomfortable." (Pleniceanu Dep. at 68-69.) According to Pleniceanu, the first time he asked Patterson to stop calling him anti-Romanian names, Patterson "seemed like he was even surprised that [Pleniceanu] would even dare to say something to him. He stopped for a brief period, a week or so, and then he started it again, just like nothing ever happened." (*Id.* at 91.) On the occasion that Patterson began to again call Pleniceanu anti-Romanian names, Patterson,

---

[1]The court rejects Brown's assertion in its reply brief that this statement by supervisor Turner is inadmissible hearsay. Turner's statement is an admission by an agent of a party opponent and not hearsay. *See* Fed. R. Evid. 801(d)(2).

in front of coworker Diane Whitening, "started the discussion and said that he first thought that I was a 'butt-fucking Greek,' at which point Whitening, which is Greek, got offended and told him that, 'You shut up. You're just Wayne [Bishop's] suck-up.'" (*Id*. at 90.) The second time that Pleniceanu told Patterson to stop, Pleniceanu said to Patterson that he "did not come to work every day to hear his remarks about my national origin." (*Id*. at 92.) Pleniceanu attested that Patterson's anti-Romanian comments "did not make me feel good. It just makes you sick when you hear people talking to you like that." (*Id*.)

Despite the derogatory remarks that Patterson made to Pleniceanu, Patterson gave Pleniceanu a positive performance review on January 23, 2004. (Def. 56.1 ¶ 35; Pl. 56.1 ¶ 12.) Pleniceanu received the highest rating in the overall appraisal and in six out of eleven categories, and the second highest rating in the remaining five categories. (Pl. Ex. 16 of Ex. F.) Pleniceanu received this positive evaluation despite being disciplined a month earlier in December 2003 for signing up his operator assistant, Howard Orcutt ("Orcutt"), for overtime and then working Orcutt's overtime shift if Orcutt could not do it. (Def. 56.1 ¶ 34; Pl. Res. 56.1 ¶ 34.) Pleniceanu admitted to engaging in this conduct but claims to not know at the time that his conduct was improper. (Def. 56.1 ¶ 34; Pl. Res. 56.1 ¶ 34.)

The event leading to Pleniceanu's termination occurred on February 9, 2004. Patterson asked Pleniceanu to take another worker to the hospital due to a workplace injury, and then return to the hospital to bring the worker back to the plant. (Def. 56.1 ¶ 36.) While Pleniceanu was gone, another operator Michael Klehr ("Klehr") supervised the operation of Pleniceanu's machine along with Pleniceanu's operator assistant, Orcutt, who was responsible for pulling the time stamps. (*Id*.) Unbeknownst to Pleniceanu, Orcutt did not pull the time stamps at the

appropriate intervals. (*Id.* at ¶ 37.) When Pleniceanu returned from his trip to the hospital to pick up the injured worker, Pleniceanu signed the time stamps provided by Orcutt as acceptable without checking the time stamps for quality issues. (*Id.* at ¶ 37; Pl. Res. 56.1 ¶ 37.) Before the end of his shift, Pleniceanu took the signed time stamps to the bindery office, as was the practice. (Def. 56.1 ¶ 38.) Although Klehr supposedly pulled two time stamps during the time he operated Pleniceanu's machine, those time stamps were never found. (Pl. 56.1 ¶ 25; Pleniceanu Dep. at 107.)

After Pleniceanu had dropped off the time stamps at the bindery office, the operator on Pleniceanu's machine for the following shift, Gary Beckett ("Beckett"), and Pleniceanu noticed that Pleniceanu's machine had been running with an incorrect insert during the shift change. (*Id.;* Pl. Res. ¶ 38.) Pleniceanu returned to the bindery office and retrieved the time stamps from his machine. (Def. 56.1 ¶ 38.) Pleniceanu then placed the time stamps with a set of correct inserts in his locker. (*Id.*) According to Pleniceanu, he placed the time stamps in his locker instead of the bindery office, so that he could later pinpoint at what time the wrong insert began to go into the books. (Pl. 56.1 ¶¶ 29, 30.) Pleniceanu did not think that the first shift would need the time stamps to correct the problem, and, in any event, Beckett, the first shift operator, and Joe Garopolo, a binder trainer, saw Pleniceanu put the books in his toolbox, and so Pleniceanu believed that they knew where the time stamps were. (Pl. 56.1 ¶ 30; Pleniceanu Dep. at 115.) Pleniceanu did not have time to stay longer to check to the books because his son, who was ill and required surgery, had a doctor's appointment. (*Id.*) Before leaving Pleniceanu informed Patterson that his machine had incorrect inserts in the loader, and Patterson told Pleniceanu that "if the first shift knows about it, don't worry about it." (Def. 56.1 ¶ 38; Pl. Res. 56.1 ¶ 38.)

Patterson and Pleniceanu then both left.

The operators on the first shift set about correcting the books. Pleniceanu's locker was either broken into or the master key obtained, so that the time stamp books could be retrieved. (Def. 56.1 at 39.) There is no evidence in the record, however, that the other operators needed the time stamps to correct the books. The time stamps and a set of the correct inserts were found in Pleniceanu's locker. (*Id.*) The problem was corrected before noon that day. (Pleniceanu Dep. at 105.)

When Pleniceanu arrived at work the next day on February 10, 2004, he realized, when looking at the time stamps, that mistake was bigger than he had initially thought and informed Patterson. (Pl. 56.1 ¶ 33.) Patterson asked Pleniceanu to come to the bindery office, where Patterson, Bishop, Assistant Bindery Manager Pat Bayer ("Bayer"), and Assistant Bindery Manager Everett Longmore ("Longmore") were waiting to meet with Pleniceanu. (Pleniceanu Dep. at 143; Pl. Res. 56.1 ¶ 40.)

Bishop had already learned of Pleniceanu's error during the first shift on February 10, 2004. (Def. 56.1 ¶ 40.) During the one-hour long meeting with Pleniceanu, Bishop, Bayer, Longmore, and Patterson asked Pleniceanu questions "one after another." (Pleniceanu Dep. at 143.) To Pleniceanu, the meeting felt like an interrogation. (*Id.*) At the meeting, Bishop explained to Pleniceanu that he believed Pleniceanu had circumvented the time stamp procedures, and then planned, when he placed the time stamps in his locker, to falsify the records and cover up the error. (Def. 56.1 ¶ 40; Pl. Res. 56.1 ¶ 40.) Pleniceanu was also asked by Bishop and Longmore, "How would this [Pleniceanu's actions regarding the time stamps] make Andy [Patterson] look." (Pl. Res. 56.1 ¶ 40.)

When Pleniceanu began to explain his side of the story, Bishop told Pleniceanu that many of these facts were new to him and that he would investigate the matter further. (Pleniceanu Dep. at 111.) For example, according to Bishop, he learned from Pleniceanu—not Patterson—that Pleniceanu had informed Patterson of the mistake at the time of discovery.[2] (Pl. Res. 56.1 ¶ 40; Bishop Dep. at 48; Davis Dep. at 15, 27.) Bishop learned from Pleniceanu for the first time that he was not operating his machine during the relevant period because he had taken another employee to the hospital. (Pleniceanu Dep. at 111.) It also appears, based on the record, that Patterson did not inform Bishop that Pleniceanu came to Patterson at the beginning of Pleniceanu's shift to tell Patterson that the mistake was bigger than Pleniceanu initially believed. Pleniceanu was told by Bishop and Patterson not to come back to work until the issue was resolved. (Pleniceanu Dep. at 111, 112.)

Bishop decided to terminate Pleniceanu and arranged a meeting with Pleniceanu on February 16, 2004, where Bishop read to Pleniceanu from a letter of termination. (Pl. Ex. 4 of Pl. Ex. C; Pleniceanu Dep. at 141.) As stated in the letter and told to Pleniceanu, Bishop had determined that Pleniceanu's placing of the time stamps in his locker were "an attempt on your part to provide yourself an opportunity to correct the timestamps and hide the fact that a problem had occurred." (Pl. Ex. 4 of Pl. Ex. C; Pleniceanu Dep. at 141.) Bishop believed that Beckett had brought the error to Pleniceanu's attention and that Pleniceanu had hidden the time stamps in his locker with the intention to later falsify them. (Pl. Ex. 4 of Pl. Ex. C.) Bishop also viewed

_____

[2]According to Davis, at some point, Patterson said that Pleniceanu had "said something to [Patterson] in passing on the way out that some of the books had wrong blow cards. He [Patterson] didn't think it was that many, figured it was maybe one or whatever the case may be." (Davis Dep. at 27-28.). From the record, it is not clear at what time Patterson said this statement and to whom.

Pleniceanu's alerting Patterson of the error in a negative light; suggesting that Pleniceanu had intentionally lied to Patterson initially about the size of the error. (*Id.*) Bishop explained to Pleniceanu that Pleniceanu was being fired because it was believed that Pleniceanu had intended to hide his error and falsify records. (Pl. Ex. 4 of Pl. Ex. C.) Bishop further explained in the February 16, 2004 meeting that Pleniceanu was being fired based on a lack of integrity. (Pl. Res. 56.1 ¶ 40; Pl. 56.1 ¶¶ 37, 38.) Bishop went on to state that there were a lot of people who had undermined their integrity with him, but when asked by Pleniceanu how many of those people who had undermined their integrity Bishop had fired, Bishop replied that he had not fired any of them. (Pl. Res. 56.1 ¶ 40; Pl. 56.1 ¶ 37.)

In reaching the conclusion that Pleniceanu had intended to falsify the time stamps and hide his error and that Pleniceanu should be terminated, Bishop had input about the factual circumstances from Patterson. (Pl. Res. 56.1 ¶ 40; Bishop Dep. at 48; Davis Dep. at 15, 27.) Patterson had previously told his subordinates, including Pleniceanu, that if one of them was being falsely accused, that he would stand up for them. (Patterson Dep. at 73.) Patterson did not stand up for Pleniceanu. (Patterson Dep. at 73.) Nor did Patterson bring up Pleniceanu's past positive rating on his performance review. (*Id.*) Patterson would have been the person to provide Bishop with Pleniceanu's overall record with the company, but he did not do so. (Pleniceanu Dep. at 151; Patterson Dep. at 73.) Although Bishop did not take into account Pleniceanu's past positive performance review from January 2004, Pleniceanu's previous disciplinary violation from December 2004 for taking Orcutt's overtime was considered. (Def. Ex. 3 of Ex. F.)

Pleniceanu made several efforts to provide his version of the event and to save his job.

After Bishop read Pleniceanu the termination letter at the February 16, 2004 meeting, Pleniceanu presented his version of the story and told Bishop that Orcutt had pulled time stamps incorrectly, that Klehr's time stamps had not been recovered, and that Pleniceanu had been at the hospital with another employee.  (Pleniceanu Dep. at 116.)  In addition, Pleniceanu attended two more meetings with Bishop and Bayer at Brown regarding his job.  (Pleniceanu Dep. at 122.)  Pleniceanu also contacted Longmore to tell him about the events of that night.  Pleniceanu told Longmore that he would never falsify anything for fear of losing his insurance for his child, and also to point out that Klehr's books were never found.  (Pleniceanu Dep. at 107-08.)  Finally, Pleniceanu sent an email to a man named Jim Myers (whose position at Brown was not identified), in which Pleniceanu reiterated that he had not intended to falsify records, that he was not hiding the time stamps by placing them in his locker, and that he informed Patterson of the mistake when it happened.  (Def. Ex. 3 of Ex. F.)

Of the other two employees involved in the February 9, 2004 incident, Howard Orcutt was disciplined for his actions on that day almost a full month after the event, on March 4, 2004.  (Patterson Dep. at 68-69.)  Michael Klehrs, whose time stamps from that day were never found, was also disciplined.  Neither employee was fired.  (Pleniceanu Dep. at 170.)

Normally, the printing of books that did not match the customer's specifications was not cause for termination.  (Patterson Dep. at 50.)  The record contains several "write-ups" of employees who were disciplined—some multiple times—but not fired for violating time stamp procedures, including Jim Moore, Leonard Jagielski, Kyle Zange, Michael Turner, Tim Waite, Mike Mogan, and Julio Torres ("Torres").  (Pl. Exs. 5-31 of Ex. C.)  All the errors by these employees were treated as unintentional mistakes, including an error by operator Torres, which

Pleniceanu claims was an intentional falsification. (Pl. Res. 56.1. ¶ 41; Pleniceanu's Dep. at 44.)
According to Pleniceanu, Torres intentionally changed the settings on his machine to falsify
production records, but the error was treated as unintentional, and Torres received only a two-
day suspension. . (Pl. Res. 56.1. ¶ 41; Pleniceanu's Dep. at 44; Pl. Ex. 18 of Ex. C.) Pleniceanu
believes that Patterson, as his supervisor, should have "fought" for Pleniceanu's job based on his
past performance as a machine operator, like he fought for another employee's job, Bryce Aiken,
who had violated the time stamp procedures and received only a two-day suspension based on
Patterson's recommendation. (Pleniceanu Dep. at 160.)

Following Pleniceanu's termination, Pleniceanu timely exhausted his administrative
remedies by filing a discrimination charge with the Equal Employment Opportunity Commission
and the Illinois Department of Human Rights on April 19, 2004. After receiving a right to sue
letter on August 31, 2005, Pleniceanu filed a complaint in federal court against Brown, alleging
federal claims of hostile work environment (Count I) and discriminatory discharge based on
national origin (Count II), and state claims of intentional infliction of emotional distress (Count
III) and negligent infliction of emotional distress (Count IV). In response, Brown has filed the
pending motion for summary judgment.

LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper
"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with
the affidavits, if any, show that there is no genuine issue as to any material fact and that the
moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). This court's
function is not to weigh the evidence and determine the truth of the matter, but to determine

whether there is a genuine issue for trial. A party who bears the burden of proof on a particular issue, however, may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). In considering a motion for summary judgment, this court is not required to scour the record in search of evidence to defeat the motion; the nonmoving party must identify with reasonable particularity the evidence upon which the party relies. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003). Finally, the evidence relied upon must be competent evidence of a type otherwise admissible at trial. *Stinnett v. Iron Work Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002).

To prove a claim of discriminatory discharge under the direct method, an employee must establish that an employer's decision to take a materially adverse employment action against the employee was motivated by impermissible discriminatory animus. *Rhodes v. Ill. Dep't of Trans.*, 359 F.3d 498, 504 (7th Cir. 2004). A plaintiff may prevail under the direct method either by proving an admission of discriminatory animus by the employer, or by constructing a convincing mosaic of circumstantial evidence from which a jury could infer intentional discrimination by the decisionmaker. *Phelan v. Cook County,* 463 F.3d 773, 780 (7th Cir. 2006). Such evidence may include (1) suspicious timing, ambiguous statements, or statements from which the inference of discriminatory intent could be drawn; (2) evidence that similarly situated employees were treated differently; or (3) evidence that the employer's reason for firing the employee was pretext. *Phelan,* 463 F.3d at 781; *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720-21 (7th Cir. 2005).

To succeed on a claim of hostile work environment, the plaintiff must establish that a

reasonable person would find the relevant conduct hostile or abusive, and that the plaintiff actually did. *See Rhodes v. Ill. Dep't of Trans.,* 359 F.3d 498, 505 (7th Cir. 2004). When determining whether the conduct objectively created a hostile work environment, the court considers the frequency of the discriminatory conduct, whether it was physically threatening or humiliating rather than simply an offensive utterance, and whether it unreasonably interfered with an employees's work performance. *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002). The plaintiff must also establish that the harassment was based on his membership in a protected class; that the conduct was severe or pervasive, and that there is a basis for employer liability. *Cerros v. Steel Tech., Inc*., 288 F.3d 1040, 1045 (7th Cir. 2002). "Harassment by a supervisor triggers strict liability, subject to the possibility of an affirmative defense in the event that the plaintiff suffered not tangible employment action." *Rhodes*, 359 F.3d at 505; *see Faragher v. City of Boca Raton*, 524 U.S. 775, 808 (1998. To fit the Title VII definition of a supervisor, a person must have the power to directly affect the terms and conditions of the plaintiff's employment, and not merely oversee aspects of the plaintiff's job performance. *Rhodes*, 359 F.3d at 506.

<u>ANALYSIS</u>

A. Discriminatory Discharge (Count II)

The court first addresses Pleniceanu's claim of discriminatory discharge. This case is one of the rare circumstances where there is direct evidence of discriminatory animus: Patterson's near-daily anti-Romanian comments to Pleniceanu, taken along with Patterson's comments about having the power to demote Pleniceanu. At issue is whether Patterson's documented discriminatory animus played a role in the materially adverse action of Pleniceanu's

termination.

The prejudices of nondecisionmaker may be imputed to the decisionmaker with formal authority over the plaintiff's job where the nondecisionmaker conceals relevant information or feeds false information to the decisionmaker, and thus influences the decision. *Lust v. Sealy, Inc.*, 383 F.3d 580, 585 (7th Cir. 2004). In other words, an employer may be liable for a discrimination where it acts as a conduit for another employee's bias. *Byrd v. Ill. Dep't of Pub. Health*, 423 F.3d 696, 709 (7th Cir. 2005). The causal link, however, could be broken if the action taken against the employee is for independent reasons untainted by the illicit motive of the biased employee who provided input. *Id.* at 708.

In this case, there are genuine issues of material fact with regard to whether Patterson influenced the decisionmaking process by concealing relevant information or feeding false information to the decisionmaker, thus imputing his discriminatory animus to the decisionmaker. What is known from the record, taking all facts and inferences in favor of Pleniceanu, is that Bishop terminated Pleniceanu because Bishop believed that Pleniceanu intended to falsify the time stamps and hide his mistake and not on account of the mistake alone. This conclusion was reached based at least in part Patterson's input into the factual circumstances, and Bishop relied on the supervisors for input regarding disciplinary errors. Patterson did not provide Bishop with all the relevant information. Bishop had to learn from Pleniceanu that Pleniceanu informed him of the mistake and that Pleniceanu had not been operating the machine during the relevant period. Patterson also concedes that he did not stand up for Pleniceanu. Nor does it appear from the record that Patterson told Bishop that Pleniceanu informed Patterson the next day that the mistake was bigger than he thought. Patterson also concedes that he did not discuss with Bishop

Pleniceanu's overall record as an employee, which included an evaluation by Patterson giving Pleniceanu the highest rating that Pleniceanu received a month after the December 2003 disciplinary violation regarding Orcutt's overtime. In addition, there is no evidence in the record that distinguishes what Bishop learned from Patterson and what he may have learned from other individuals. Bishop's deposition testimony does not enable the court to determine how he conducted his investigation of the events of February 9, 2004.

In addition, before Pleniceanu had a chance to fully explain his version of events to Bishop, Bishop presented Pleniceanu with a termination letter at their second meeting on February 16, 2004. The termination letter presented an interpretation of the facts that differed from Pleniceanu's version of events and reflected a belief that Pleniceanu's actions were influenced by a motive to cover up his mistake and attributing to him the motive of lying. Based on Patterson's providing factual input to Bishop and failing to stand up for Pleniceanu, the evidence establishes that Patterson withheld from Bishop critical information, including that Pleniceanu told Patterson about the mistake and its size upon discovery of each. An inference can be drawn that the factual input Patterson provided Bishop helped to shape this negative view of Pleniceanu's behavior and led to Bishop's belief that Pleniceanu did not just commit a mistake but intended to cover up the mistake. *See Maarouf v. Walker Mfg.Co.*, 210 F.3d 750, 754 (7th Cir. 2000) ("if the perception of poor work performance was based upon [the biased nondecisonmaker's] input, then [plaintiff] has presented sufficient evidence of pretext to survive summary judgment.")

The court is also troubled by the way in which Brown disciplined the two other employeesinvolved in the February 9, 2004 incident, who were not Romanian. No intention to

falsify time stamps was ever ascribed to Klehr, the operator running Pleniceanu's machine, even though his two time stamps were never located. Further, Brown waited a month before eventually disciplining but not firing Orcutt, the assistant operator who was the employee that violated the time stamp policy on February 9, 2004.

In addition, although neither party provided sufficient information about the circumstances of other operators who violated time stamp procedures but were not fired for the court to draw any inference regarding whether similarly situated individuals were treated differently, the court notes that the record is rife with other disciplinary violations by operators of time stamp procedures. Yet, in none of these other violations are the operators accused of attempting to cover up the mistake. Furthermore, Pleniceanu claims that the conduct of at least one of these operators, Joe Torres, constituted falsification of records, even though he was cited only for a violation of the time stamp procedures and given a two-day suspension. There is also a question about whether Patterson disparately chose not to "fight" for Pleniceanu but "fought" for less disciplinary penalties for other workers, such as Aiken and possibly Klehr. *See Byrd*, 423 F.3d at 711 (complaints by a biased nondecisionmaker about an employee that results in disparate, race-based treatment may be evidence of discrimination). Given the requirement on summary judgment that the court take all facts and inferences in favor of the nonmoving party, the court determines that there are genuine issues of material fact regarding whether Patterson concealed relevant information from or fed false information to Bishop about the circumstances leading to Pleniceanu's termination, and as a result influenced the decisionmaker. The court denies summary judgment on Pleniceanu's claim of discriminatory discharge.

B. Hostile Work Environment (Count I)

In opposition to Pleniceanu's hostile work environment claim, Brown argues that the derogatory comments made by Patterson were not sufficiently severe or pervasive to affect the terms and conditions of Pleniceanu's employment, and that there is no employer liability. Brown first contends that Patterson's conduct was not objectively or subjectively offensive, asserting that Plencieanu's own statement to Schneider that he could "handle" Patterson's comments demonstrates that the conduct, "while perhaps, juvenile, vulgar and unpleasant," was not actionable. (Def. Br. at 7.) In addition, Brown argues that Patterson's conduct was not sufficiently severe or pervasive in that the conduct did not alter Pleniceanu's work conditions as established by his continued attendance and positive performance at work.

Conduct amounting a hostile work environment need not be both severe and pervasive. *Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007). A sufficiently severe episode of harassment may only occur once for liability to attach, while a continuous pattern of less severe harassment may over an extended time, "be pervasive enough and corrosive enough that it meets the standard for liability." *Id.*; *see Cerros*, 288 F.3d at 1044. The question is whether the harassment is severe or pervasive enough to alter the terms or conditions of the employment relationship. *Jackson*, 474 F.3d at 499; *Cerros*, 288 F.3d at 1044. The Seventh Circuit has recognized that an unambiguously racial epithet is considered severe. *Cerros*, 288 F.3d at 1044 (*citing Rodgers v. W-S Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993)).

The near-daily derogatory remarks that Patterson made to Pleniceanu about his Romanian national origin, along with his threats to demote or terminate Pleniceanu, without question are both severe and pervasive. *See Cerros*, 288 F.3d at 1044 (derogatory remarks by supervisors and abusive graffiti are both pervasive and severe); *Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d

696, 705 (7th Cir. 2001) (concluding that plaintiff was subject to six rather severe instances of harassment based on derogatory statements said by supervisor)  In addition, there are genuine issues of material fact with regard to whether these severe and pervasive near-daily derogatory remarks altered the terms and conditions of Pleniceanu's work.  There is evidence in the record that Pleniceanu felt degraded by the comments and the comments made him sick to his stomach, and that he was afraid to complain about the remarks to Bishop based on Patterson's perceived friendship with Bishop and Patterson's threats to terminate or demote him.  Added to the degrading nature of Patterson's remarks and his threats was Pleniceanu's fear of losing his job and thus his health insurance for his sick child.  The continuation of the harassment by Patterson even after Pleniceanu asked him twice to stop and Patterson attended the December 2004 meeting reviewing Brown's anti-harassment policy further suggests a hostile work environment and undercuts any argument that Patterson was merely teasing Pleniceanu or lacked proper sensitivity.  *Shanoff,* 258 F.3d at 704-05.  Given this record, the court easily finds that there is evidence from which a jury could reasonably conclude that the harassment by Patterson of Pleniceanu was severe or pervasive enough to alter the conditions and terms of his employment.

Brown next argues that, even if the harassment was sufficiently severe or pervasive, there can be no employer liability.  Brown contends that Patterson does not fit the definition of a supervisor under Title VII and so the tangible employment action of Pleniceanu's termination should be considered unrelated to the harassment.  Pleniceanu challenges Brown's position, claiming that Brown should be held strictly liable for the harassment based on supervisor Patterson's involvement in the tangible employment action of Pleniceanu's termination.

The court agrees with Pleniceanu.  As set out above in the court's discussion of the

discriminatory discharge claim, there are genuine issues of material fact related to the influence that Patterson as a biased nondecisionmaker had over the decisionmaker, Bishop, and whether Patterson supplied Bishop with false information or withheld information, especially given that Patterson was harassing Pleniceanu up until the beginning of February 2004 when Pleniceanu was fired. The same analysis of imputed liability of a nondecisionmaker to a decisionmaker for claims discriminatory discharge applies in the context of a hostile work environment claim. *See Byrd*, 423 F.3d at 710-11. As a result of Patterson's role in Pleniceanu's termination, the tangible employment action taken by Bishop, the decisionmaker, is tainted by the harassing supervisor, Patterson. Brown is thus strictly liable and its affirmative defenses are not applicable. *Id.*

The court also rejects Brown's argument that laches should apply. According to Brown, Pleniceanu's failure to inform Brown before his termination of the harassment constitutes undue delay and Brown was prejudiced by Pleniceanu's actions because Brown was unable to remedy the harassment. The Supreme Court in *Nat'l Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), recognized the defense of laches for hostile work environment claims where an employee unreasonably delayed in filing a suit and as a result harmed the defendant. *Id.* at 121. The doctrine of laches is inapposite here. Pleniceanu was harassed for a four-month period before being terminated in a decision illicitly influenced by his harasser. Not only is this not an unreasonable delay of the kind the laches defense was intended to address, but applying laches would allow Brown to make an end-run around the strict liability principle applied to tangible employment decisions by harassing supervisors. By allowing a laches defense, Brown would revive, through the prejudice prong, the affirmative defenses allowed in situations where no

tangible employment action has occurred. The court denies Brown's motion for summary judgment with regard to Pleniceanu's hostile work environment claim.

C. Intentional and Negligent Infliction of Emotional Distress (Counts III & IV)

Brown also challenges Pleniceanu's claims of intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED"). Pleniceanu provided no response to Brown's argument outside of raising the claims initially in the complaint. The claims are thus waived. *Kaupas v. Vill. of Univ. Park,* No. 02 C 3674, 2003 WL 22048173, *11 (N.D. Ill. Sept. 2, 2003); *Thompson v. G.E.S., Exposition Serv*., No. 97 C 7405, 2001 WL 321998, *3 (N.D. Ill. Apr.2, 2001).

Even if Pleniceanu has not waived the claims, the Illinois Human Rights Act ("IHRA") , 775 Ill. Comp. Stat. 5/1-101 et seq., "preempts tort claims that are 'inextricably linked' to allegations of sexual harassment and requires that such claims be brought only before the Illinois Human Rights Commission." *See Quantock v. Shared Mktg. Servs., Inc*., 312 F.3d 899, 905 (7th Cir. 2002) (per curiam); *Maksimovic v. Tsogalis*, 687 N.E.2d 21, 23 (Ill. 1997). This reasoning has been applied to IIED claims, and presumably NIED claims, inextricably linked to racial harassment as well. *Kaupas,* 2003 WL 22048173 at *11. Pleniceanu's claim of harassment based on national origin is the entire basis of his IIED and NIED claims and was not just "'merely incidental'" to a mundane tort. *Smith v. Chicago Sch. Reform Bd. of Tr.*, 165 F.3d 1142, 1151 (7th Cir. 1999) (*quoting and citing Makismovic*, 687 N.E.2d 21 in comparison). In his complaint, Pleniceanu alleges that the basis of the conduct for both claims was "national origin discrimination, ethnic slurs, and associated work-related harassment." (Cmpl. ¶¶ 26, 28.) The harassment based on national origin is Pleniceanu's core theory of his IIED and NIED

claims, and, as such, is preempted by the IHRA. *Smith*, 165 F.3d at 1151. The court grants

summary judgment on the state claims of intentional and negligent infliction of emotional distress.

## CONCLUSION

Accordingly, the defendant's motion for summary judgment (Dkt. No. 25) is denied on Counts I and II of the complaint and granted on Counts III and IV of the complaint. The case is set for further status on April 5, 2007 at 9:00 a.m. to schedule dates for trial. The parties are encouraged to discuss settlement.

ENTER:

JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: March 12, 2007